446 A.2d 234

**AIRWAY ARMS, INCORPORATED, d/b/a Airport Mobil Service, et al., Appellees,**

v.

**MOON AREA SCHOOL DISTRICT, Appellant.**

**James E. TRICCO, James A. Davis, et al., Appellees,**

v.

**MOON AREA SCHOOL DISTRICT, Appellant.**

Supreme Court of Pennsylvania.

Argued March 1, 1982.

Decided May 28, 1982.

288

John A. Robb, Jr., Robb, Leonard & Mulvihill, Pittsburgh, for appellants.

Richard H. Martin, Joan P. Feldman, Baskin & Sears, Pittsburgh, for appellees in No. 66.

John H. Bingler, Jr., Jeffrey S. Blum, Glenn E. Bost, II, Thorp, Reed & Armstrong, Pittsburgh, for appellees in No. 67.

Before ROBERTS, NIX, LARSEN, McDERMOTT and HUTCHINSON, JJ.

## OPINION

NIX, Justice.

The Moon Area School District (District) imposed a local tax on paid parking in the district. In this consolidated appeal,[1] we are asked to consider whether 1) appellees have standing to prosecute the actions, 2) the tax violates the Commerce and Due Process Clauses of the United States Constitution and 3) such a tax is authorized under the Local Tax Enabling Act, Act No. 511 of 1965, as amended, 53 P.S. § 6901 *et seq.* (the Act).

### I.

On March 26, 1979 Moon Area School District pursuant to the Act enacted Resolution 79–2 which sets out a parking tax upon parking in all non-residential parking facilities located within the district for the purpose of raising revenues for the operation of the schools in the district. The resolution requires patrons to pay a tax at the rate of 15% of the consideration for each parking transaction. Operators of non-residential parking places are required to obtain a registration certificate at an annual cost of Ten ($10.00) Dollars, to collect the parking tax from patrons, keep chronological records of all transactions, and file monthly returns with the tax collector. Any operator's failure to comply with certain conditions subjects the operator to a monetary penalty that may equal 100% of the proper tax as well as penalty and interest. Criminal sanctions not to exceed $500.00, or upon default, imprisonment of less than thirty days are also provided.[2]

1. Jurisdiction to hear this appeal is conferred upon this Court by the Act of 1976, July 9, P.L. 586, No. 142, § 2, as amended, 42 Pa.C.S.A. § 724.

2. The relevant sections of Resolution 79–2, Parking Tax Resolution, of the Moon Area School District provide:

 SECTION 3. IMPOSITION AND PAYMENT OF TAX:

 For the period of April 25, 1979 to June 30, 1979, and thereafter on the fiscal year basis of from each July 1 to each following June 30, a tax for general revenue purposes is hereby levied upon each and every patron for each and every parking transaction at the rate of 15

per centum (15%) on the consideration thereof. Every operator with each transaction shall add said tax to the consideration charged and shall obtain payment of said tax from the patron as a condition for the allowance of the parking or storing, and the fact of such allowance shall, and the fact of collection of the consideration shall conclusively presume the collection of the tax.

SECTION 4. PARKING REGISTRATION CERTIFICATES:

(a) On or after the effective date of this Resolution, it shall be unlawful for any person and/or any operator to conduct, continue to conduct, or thereafter begin to conduct any parking transaction with reference to a non-residential parking place within the School District until or unless a Parking Registration Certificate or Certificates shall have been issued to said operator, and unless the tax imposed hereunder is accounted for in accordance with the provisions of this Resolution.

(b) Every person and/or operator desiring to continue to conduct or to begin to conduct any parking transaction, with reference to a non-residential parking place within the School District shall file annually an application for Parking Registration Certificate or Certificates for each parking place with the Collector. Every application for such Certificate or Certificates shall be made upon a form prescribed and furnished by the Collector, and authorized by the Board of School Directors of the School District. Such application shall set forth the name under which the applicant conducts such parking transactions, the location of the place of said parking place, the size and vehicle capacity of said parking place, and other such pertinent information as may be required by the Collector. If the applicant has or intends to have more than one place of such parking within the School District, the applicant shall state the required information with respect to each and every such place of parking. If the applicant is other than an individual, the names and addresses of the principal officers thereof, and any other reasonable information required by the Collector, shall be stated in the application. The application shall be signed and sworn to by the applicant. The Collector may require that the application be verified by oath or affirmation.

(c) Upon a proper application being made, the Collector shall charge a registration and certificate fee of Ten Dollars ($10.00) annually for each certificate which shall be paid by the applicant and the Collector shall grant and issue to such applicant a Parking Registration Certificate for each place of non-residential parking as set forth in the application. A Parking Registration Certificate shall not be assignable and shall be valid only for the person and/or operator in whose name it is issued, and it shall be valid only for the conducting of non-residential parking at the place designated therein. Said Parking Registration Certificate shall at all times be conspicuously displayed at the place for which issued.

(d) The Collector may suspend, or after hearing, revoke a Parking Registration Certificate whenever the Collector finds that the holder thereof has failed to comply with any provision of this Resolution. Upon suspending or revoking any Parking Registration Certificate, the Collector shall request the holder thereof to surrender immediately all Parking Registration Certificates and duplicates thereof.

Whenever the Collector suspends a Parking Registration Certificate, he shall notify the holder thereof immediately of such action and shall afford the holder a hearing, if one is desired and has not already been afforded. After such hearing, the Collector may either rescind his order of suspension, continue said suspension, or revoke the Registration Certificate or Certificates.

SECTION 5. RECORDS:

(a) Each operator shall maintain, separately with respect to each parking place, complete and accurate records of all transactions, of the total amount of consideration received from all transactions, and the total amount of tax collected on the basis of such consideration, and the same shall be done on a uniform daily basis. Each operator shall issue to the person paying the consideration such written evidence of the transaction as the Collector may prescribe by regulations.

(b) As to all transactions otherwise than on a unit per occurrence basis, the Operator shall make, have and keep segregated records of all such transactions, or if oral, then to do so by a record of relevant data as adequately describes each such transaction for calculation of the proper tax. Records shall be made at the time of the transactions. They shall be kept in chronological order.

(c) Each Operator shall afford the Collector and his designated agents and employees access to all such records and evidence at all reasonable times and shall provide verification of the same as the Collector may require. The Collector and his agents are hereby authorized at reasonable times and in reasonable manner to examine the books, papers and records of any operator in order to verify the accuracy of any return made.

(d) If no return has been made, or if a false return has been made, or if the operator's records are not properly made or kept, or if the operator of anyone under his control in any way obstructs an orderly audit or investigation relating to the determination of the proper tax due, then the Collector may make such assessment of what he reasonably determines to be the proper tax due, may add a liquidated damages assessment of up to one hundred per centum (100%) of the proper tax, and any fine as may be imposed under Section 9 shall be in addition to the liabilities hereunder.

SECTION 6. RETURNS AND PAYMENTS:

Each Operator in collecting the tax (under Section 3) shall do so as the agent and trustee for the School District under the provisions and for the purposes hereof; and, on the form prescribed by the Collector, shall file with him by the 15th day of each month, returns on all transactions of the Operator in the preceding calendar month. With such filing the Operator shall pay to the Collector all taxes due hereunder for such preceding month, such "taxes due" being the full tax that the Operator was charged hereunder to obtain from his patrons less two per centum (2%) thereof as compensation to the Operator for his services. Every Operator who fails to comply with the provisions hereof shall be deemed to have acknowledged his intentional failure of consideration and of his voluntary surrender of such compensation.

\* \* \* \* \* \*

There are presently six non-residential parking operations which provide an approximate aggregate of six thousand one hundred fifty (6,150) parking spaces. A substantial number of these spaces are used by persons utilizing the Greater Pittsburgh International Airport as all of the parking lots are closely situate in the locale of the Airport.[3] Air traffic at the airport is both interstate and intrastate.

Challenges to the tax are residents of the school district, non-residents of the district, two airlines that service the airport and have an interest in the parking lot at the airport, operators of several of the lots, and the owner/lessors of the realty on which the parking concessions operate. These challengers filed appeals from the tax levy on April 6, 1979. On the same day, by order of then Judge John Flaherty, the appeals acted as a supersedeas until hearing which was held May 7, 1979.[4] The lower court declared the tax unconstitutional. The Commonwealth Court affirmed the lower court.

SECTION 8. COLLECTION AND PENALTY AND INTEREST:
All taxes, assessments, penalties and interests due from the Operators under this Resolution shall be paid to the Collector. Any Operator who fails to file a proper report as due or who fails to make proper payment as due, shall pay also a penalty of an additional ten per centum (10%) of the amount of the tax, and in addition, shall pay interest on the tax at the rate of one per centum (1%) per month or fraction thereof from the due date, the same being in addition to liabilities under Section 5(d) and Section 9.
SECTION 9. PENALTIES:
Any person who violates any provision of this Resolution, or: any regulation adopted pursuant to it shall, upon conviction thereof before any magistrate, be liable for a fine not to exceed more than Five Hundred Dollars ($500.00), or, in default thereof shall be imprisoned for a period not to exceed thirty (30) days. Each violation shall constitute a separate offense. Such penalties so imposed shall be in addition to all other liabilities otherwise imposed under any other of the provisions hereof, and shall be in addition to any other liability that may be applicable under any other provisions of law, civil, equity, and criminal.

3. The largest of the lots is at the airport and operated by a parking concessionaire-Grant-Oliver Corporation. The other five (5) lots are adjacent to the Airport. Grant-Oliver has a park-and-lock type of parking. The other parking is "valet" parking.

4. By agreement of the parties, challenges to the continuation of the supersedeas and motion for a bond were withdrawn for a period extending until thirty (30) days after the trial court's decision on the merits. The challenges together with the bond question have been reasserted before this Court.

The District petitioned for allowance of appeal from the decision of the Commonwealth Court in both cases to this Court. The petitions were granted and the appeals consolidated.

Appellant raised the questions of appellees standing to attack the validity of the tax through preliminary objections which were denied below. The essence of appellant's standing argument on appeal is that appellees did not allege specifically that they were "taxpayers" and "aggrieved parties," the standing requirements of the Act,[5] and that being subjected to the tax if appellees choose to park in one of the non-residential parking facilities is insufficient as a matter of law to establish standing. We find the arguments unpersuasive.

■ The argument that appellees have not specifically alleged they are taxpayers and aggrieved is anachronistic. Hypertechnicality and formalism in pleading does not promote a prompt determination of the validity of the taxing resolution, as envisioned by the legislature in enacting Section 6 of the Act.[6] Further, such formalism is "a reversion to seventeenth century pleading"[7] contra the modern trend.

5. 53 P.S. § 6906 provides in pertinent part:
§ 6906. Appeals by taxpayers
No tax levied for the first time by any political subdivision to which this applies shall go into effect until thirty days from the time of the adoption of the ordinance or resolution levying the tax. Within said thirty days taxpayers representing twenty-five percent or more of the total valuation of real estate in the political subdivision as assessed for taxation purposes, or taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance or resolution shall have the right to appeal therefrom to the court of quarter sessions of the county upon giving bond with sufficient security in the amount of five hundred dollars ($500), approved by the court, to prosecute the appeal with effect and for the payment of costs. The petition shall set forth the objections to the tax and the facts in support of such objections, and shall be accompanied by the affidavit of at least five of the petitioners that the averments of the petition are true and the petition is not filed for the purpose of delay.

6. *See* note 5, *supra.*

7. This expression was used by Mr. Justice Frankfurter in *Yonkers v. U.S.*, 320 U.S. 685, 698, 64 S.Ct. 327, 334, 88 L.Ed. 400 (1944):

*See, e.g., Lutz Print. v. Com. Dept. of Property,* 472 Pa. 28, 370 A.2d 1210 (1977); *William Penn Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 169, 346 A.2d 269 (1975) (plurality opinion); Pa.R.Civ.P. 126; *Rosden v. Leuthold,* 274 F.2d 747, 750 (D.C.Cir.1960) (purpose of Rules 15(b) and 54(c), Fed.R.Civ.P. is "to avoid the tyranny of formalism"). The employment or lack of employment of the terms "taxpayer" and "aggrieved" is not decisive. Rather, the question is whether facts have been alleged which support the legal conclusion that they are taxpayers who are aggrieved.

■ An examination of the record including the pleadings indicate appellees are liable to pay or collect the tax and are, thus, aggrieved taxpayers.[8] The argument raising the insufficiency of the assertion that they are subjected to the tax if they elect to use the facilities attempts to interject a voluntary aspect into the inquiry. If such a concept were adopted in determining standing to object, it would effectively preclude objection to all sales and use taxes because the operating incidents of such taxes are voluntary.

■ As a corollary to this voluntary argument, appellants have also implicitly suggested that the appellees' challenge is premature. The argument of prematurity is particularly inappropriate in this case since under Section 6 of the Act, challenges to a tax imposed pursuant to the Act must be filed within the thirty (30) days following the adoption of the taxing ordinance or resolution, which thirty (30) days are a mandatory waiting period for the taxing authority. In other words, taxing authorities, when levying a tax for the first time, must allow thirty (30) days for taxpayer appeals

> Is not insistence on such empty formalism a reversion to seventeenth century pleading which required talismanic phrases, as for instance that a seller could not be held to warrant that he sold what he purported to sell unless the buyer pleaded warrantizando vendidit or barganizasset?

**8.** Allegheny Airlines (USAIR) and Trans-World Airlines are neither potential patrons nor operators of the non-residential parking lots. However, we need not reach the question of their standing. If the remaining appellees which number more than twenty-five (25) have standing, the appeal cannot be dismissed on the ground of standing.

to be filed by prescribing an effective date at least thirty (30) days from the time of adoption of the taxing ordinance or resolution. If appellants were to succeed in their contention of prematurity, appeals not premature would be too late and no patron would be able to challenge the tax. All patrons able to file timely appeals from the tax are potential patrons. To hold that such persons do not have standing, which is absurd, contravenes the presumption "that the General Assembly does not intend a result that is absurd ... or unreasonable." Statutory Construction Act, Act of December 6, 1972, P.L. 1339, No. 290, 1 Pa.C.S.A. § 1922.

■ So, too, the tax-collection liability of the operators confers standing upon appellee/operators. *See, e.g., National Geographic Society v. California Board of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977) (sole challenger of tax had only use-tax-collection liability and standing was assumed); *Wm. Penn Park., Inc. v. City of Pitts., supra,* (plurality opinion, no dissents) (tax collection liability of parking operators sufficient for standing). The owner/lessors are *persons* subjected to the taxing resolution as are the resident and non-resident appellees, and thus, have standing.

## II.

Appellees contend that the tax violates the Commerce Clause[9] of the Constitution of the United States. It is argued that the tax imposes an impermissible burden upon interstate commerce.

■ The threshold question is whether the courts need review this local state tax under the "negative implications" of the Commerce Clause. Judicial review of such taxes under the Commerce Clause is intended

**9.** The Congress shall have Power

\* \* \* \* \* \*

To regulate Commerce with foreign Nations, and among the several States and with the Indian Tribes...."
U.S.Const., Art. I, § 8, cl. 3.

. . . to ensure that States do not disrupt or burden interstate commerce when Congress' power remains unexercised: it protects the free flow of commerce, and thereby safeguards Congress' latent power from encroachment by the several States.

*Merrion v. Jicarilla Apache Tribe,* [455] U.S. [130, 154, 102 S.Ct. 894, 910] 71 L.Ed.2d 21, 40 (Slip opinion, filed January 25, 1982).

And "[c]ourts are final arbiters under the Commerce Clause only when Congress has not acted." *Merrion v. Jicarilla Apache Tribe, supra,* 455 U.S. at 155, 102 S.Ct. at 910, 71 L.Ed.2d at 40. *See, e.g., Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 454, 99 S.Ct. 1813, 1824, 60 L.Ed.2d 336 (1979); *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 421–427, 66 S.Ct. 1142, 1150–53, 90 L.Ed. 1342 (1946).

In this case, Congress has acted affirmatively when it expressly *prohibited* head taxes on persons traveling in air commerce and expressly *permitted* "sales or use taxes on the sale of goods or services." Pub.L. 85–726, Title XI, § 1113, as added Pub.L. 93–44, § 7(a), June 18, 1973, 87 Stat. 90, 49 U.S.C.A. § 1513.[10]

**10.** 1513. State taxation of air commerce
Prohibition; exemption
(a) No state (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom; except that any State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) which levied a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom prior to May 21, 1970, shall be exempt from the provisions of this subsection until December 31, 1973.
Permissible State taxes and fees
(b) Nothing in this section shall prohibit a State (or political subdivision thereof, including the Commonwealth of Puerto Rico,

■ If the tax here is a head tax, we need not look further for Congress has spoken. *Allegheny Airlines, Inc. v. City of Philadelphia,* 453 Pa. 181, 309 A.2d 157 (1973). Although appellees have argued that the tax in question here is a head tax, that position is clearly untenable. A head tax is a tax reckoned at a fixed amount for each head (person) in a designated class.[11] The tax here is not on the heads of "persons traveling in air commerce or on the carriage of persons traveling in air commerce." The operating incidence of the tax is the transaction of parking in non-residential parking lots (which are located at or near an airport). The tax is to be borne by the patrons of the non-residential parking operations. The measure of the tax is the consideration paid for the parking transaction. It is collected by the operator of the parking facility. It is not a tax on the right to travel and clearly Congress has not prohibited such a tax under 49 U.S.C.A. § 1513.

But the permissability of sales or use taxes on the sale of goods or services in air commerce is not a congressional ratification of the specific tax in question here. Thus, judicial scrutiny of whether this tax violates the "negative implications" of the Commerce Clause is warranted.

■ We do not look to whether the tax attaches only to a "local" or intrastate activity to determine whether the tax is

the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) from the levy or collection of taxes other than those enumerated in subsection (a) of this section, including property taxes, net income taxes, franchise taxes, and sales or use taxes on the sale of goods or services; and nothing in this section shall prohibit a State (or political subdivision thereof, including the Commonwealth of Puerto Rico, the Virgin Islands, Guam, the District of Columbia, the territories or possessions of the United States or political agencies of two or more States) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.

11. Black's Law Dictionary (5th ed. 1979), p. 648, defines "head money" as "a sum of money reckoned at a fixed amount for each head (person) in a designated class. Particularly (1) a capitation or poll tax."

immune from Commerce Clause scrutiny. *See Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977); *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 141–142, 90 S.Ct. 844, 846–47, 25 L.Ed.2d 174 (1970); *Nippert v. City of Richmond,* 327 U.S. 416, 423–424, 66 S.Ct. 586, 589–90, 90 L.Ed. 760 (1946). In reviewing a Commerce Clause challenge to this local tax, we focus upon "the practical effect of [the] challenged tax," *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); *Mobil Oil Corp. v. Commissioner of Taxes,* 445 U.S. 425, 443, 100 S.Ct. 1223, 1234, 63 L.Ed.2d 510 (1980), to determine whether the tax substantially affects or is connected with interstate commerce.

■ Interstate commerce is not immune from state taxation.[12] To restate, the Supreme Court "has rejected the notion that state taxes levied on interstate commerce are *per se* invalid." *Commonwealth Edison Co. v. Montana, supra,* 453 U.S. at 615, 101 S.Ct. at 2952 *citing, Washington Revenue Dept. v. Association of Wash. Stevedoring Co.,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978); and *Complete Auto Transit v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Yet, not all state taxation of interstate commerce is valid. It will be sustained, however, if it passes scrutiny under the four part test articulated in *Complete Auto Transit v. Brady, supra.* That test says a state tax does not offend the Commerce Clause if it "is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to services provided by the state." 430 U.S. at 279, 97 S.Ct. at 1079.

■ Appellant posits that the tax is purely local in nature because the act of parking a car occurs prior to any interstate commerce. As previously stated, the local nature of the activity does not prevent Commerce Clause scrutiny.

12. "Even interstate business must pay its way." *Western Live Stock Bureau v. Bureau of Revenue,* 303 U.S. 250, 254, 58 S.Ct. 546, 548, 82 L.Ed. 823 (1938); *Postal Telegraph-Cable Co. v. Richmond,* 249 U.S. 252, 259, 39 S.Ct. 265, 266, 63 L.Ed. 590 (1919).

Because of the geographical location of the parking lots, at or near the airport, the commerce of the airport would be substantially impeded without the parking operations. There is a near interlocking relationship between the airport, the airline/appellees and the largest parking lot operator—Grant-Oliver Corporation. The record here indicates that the vast majority of patrons of the parking lots are traveling in air commerce. During 1977, 88.5 percent of the passengers flying to and from the airport flew to or from a point outside the Commonwealth of Pennsylvania. The remaining 11.5 percent of the passengers were intrastate passengers. The conclusion that the parking activity is a part of the flow of or connected with interstate commerce is inescapable.

Turning to the four-part test of *Complete Auto Transit v. Brady, supra,* we find no serious challenge by appellees to the first three prongs of the test. The only nexus of the activity or incidence of patrons' parking is within the District. There is no problem of apportionment or multiple taxation on the subject of the tax. Since patrons' parking at a non-residential parking lot in Moon Area School District is the legal incidence or subject of the tax, and it can occur in no other place, no other locality or state can tax the patrons' parking. The Moon Area Township's gross receipts parking tax is on the incidence of doing business measured by gross receipts, *Mellon Square Garage, Inc. v. Public Parking Authority of Pittsburgh,* 442 Pa. 229, 275 A.2d 654 (1941) and cannot support a claim of multiple taxation.

The claim that the tax discriminates against interstate commerce because the patrons bearing the tax are largely engaged in interstate commerce does not withstand examination. A similar argument in *Heisler v. Thomas Colliery Co.,* 260 U.S. 245, 251–253, 43 S.Ct. 83, 84, 67 L.Ed. 237 (1922) to the effect that Pennsylvania had "a virtual monopoly of anthracite coal and that, because 80% of the coal was shipped out of state, the tax discriminated against and impermissibly burdened interstate commerce . . . [was dis-

missed] as 'adventitious considerations.' " *Commonwealth Edison Co. v. Montana, supra,* 453 U.S. at 618, 101 S.Ct. at 2954. The tax burden in this case is borne according to the extent of use of the parking facilities and not on a distinction between patrons using interstate air commerce and patrons engaged in intrastate air commerce or local commerce.

■ The serious challenge to the tax is under the "fairly related" prong of the *Complete Auto Transit* test. It is repeatedly urged, and the lower court found, that there were no benefits afforded the patrons of the parking facilities by the District. The type of benefits found to be non-existent can be characterized as particular benefits afforded the patrons directly.[13] This is not the benefit or service requirement of the fourth prong of the *Complete Auto Transit* test. Under the fourth prong " 'the measure of the tax [must be] reasonably related to the taxpayers activities or presence in the state—from which it derives some benefit such as the substantial privilege of [the operating incidence]—the taxpayer will realize, in proportion to the taxes it pays, [t]he only benefit to which it is constitutionally entitled ... [:] that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes (citations omitted).' " *Commonwealth Edison Co. v. Montana, supra,* 453 U.S. at 628–29, 101 S.Ct. at 2960. Public education is a benefit of an organized society.

Nor is this a case such as *Nippert v. City of Richmond, supra,* which involved a local license and gross receipts tax to be born by interstate, itinerant drummers or salespersons whose activity of selling—the operating incidence of the tax—was not so regular, continuous or persistent in the taxing district as to constitute a "course of business."

The measure of the Moon Area School District tax is related to the taxpayers presence or activities in the district.

13. It was uncontroverted that the public may use the recreational facilities of the school district. The court below incorrectly ignored this fact in reaching its finding.

The tax is assessed under a formula which relates the tax liability to the value of the patrons' parking within the district. Therefore, under *Commonwealth Edison Co. v. Montana, supra,* the fourth prong of the *Complete Auto Transit* test is met. We are satisfied that the Moon Area School District tax comports with the four requirements of the *Complete Auto Transit* test. We now turn to the Due Process Clause challenge to the parking tax.

## III.

■■■ Appellees vigorously argue again, as a corollary to the Commerce Clause argument, that the District provides no "benefits" in exchange for the tax, and as such violates the Due Process Clause of the Constitution of the United States. U.S.Const. amend. XIV, § 1. A state's taxing power is subject to the constitutional restraints of the Fourteenth Amendment to the Constitution of the United States. And the test for determining whether property has been taken without due process of law is:

... whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given *anything* for which it can ask return." [Emphasis added.]

*Wisconsin v. J. C. Penney,* 311 U.S. 435, 444, 61 S.Ct. 246, 249, 85 L.Ed. 267 (1940).[14]

Three years before *Wisconsin v. J. C. Penney, supra,* in *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 522, 57 S.Ct. 868, 878, 81 L.Ed. 1245 (1937) where infringement of the Due Process and Equal Protection Clauses of the Fourteenth Amendment by the Unemployment Compensation Act of Alabama was at issue the Supreme Court made quite clear that:

**14.** In *Wisconsin v. J. C. Penney,* 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940) the Supreme Court upheld the validity of a state tax on the privilege of declaring and receiving dividends out of income derived from property located and business transacted in the state, in the face of a Fourteenth Amendment challenge.

"[t]he only benefit to which the taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. 301 U.S. at 522, 57 S.Ct. at 878 [15]

In this case, the lower court and the Commonwealth Court found that there was no benefit afforded appellees. We do not agree. The question in the framework of this case is almost frivolous. The district provides public education for the children residing in the district. It borders on the trite but we note again that public education is an advantage of a civilized society. A corporation cannot object to paying school taxes. *Thomas v. Gay*, 169 U.S. 264, 280, 18 S.Ct. 340, 346, 42 L.Ed. 740 (1897). A taxpayer may not successfully object, on the ground of the "benefit" theory, to taxation for a general public use which includes taxes for schools. *Kelly v. City of Pittsburgh*, 104 U.S. 78, 26 L.Ed. 658 (1881). Appellees' argument is basically what this Court rejected in *Kelly v. City of Pittsburgh*, 85 Pa. 170, 179 (1877) when it stated:

Now it may be true that the plaintiff is *not personally benefited by* either *the educational* or poor department of the city; but neither is any one not having children to educate, and not being himself a pauper. Yet, for such reason we are hardly prepared to stop the hand of the collector of school and poor rates. *He may not be personally benefited by the fire and police department; but the general municipality is largely benefited thereby, and his welfare is found in the prosperity of that municipality.* [Emphasis added.]

15. The fourth prong of the four part test of *Complete Auto Transit v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), for Commerce Clause scrutiny of state taxes, as refined in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) is derivative of *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937), *Wisconsin v. J. C. Penney Co., supra, General Motors Corp. v. Washington*, 377 U.S. 436, 84 S.Ct. 1564, 12 L.Ed.2d 430 (1964) and *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977). *See, Commonwealth Edison Co. v. Montana, supra*, 453 U.S. at 625 n.14, 18, 101 S.Ct. at 2958 n.14, 18.

The activity of parking within the school district in order to have easy access to the airport, as well as the availability to the public of the school district's recreational facilities are more than sufficient personal benefits which concretize the necessary general benefit of participating in an orderly and civilized society.

We see no reason to depart from these sound principles and thus find the tax does not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## IV.

 Appellees argue, and the lower court agreed, that the taxed transaction at the valet parking lots is a "retail sale" of a valet parking service which involves the transfer of possession of tangible personal property. It is urged that the amount of the tax exceeds the limit set by Section 8(4) of the Act, 53 P.S. § 6908(4).[16] Appellees rely upon *Taylor v. Philadelphia Parking Authority*, 398 Pa. 9, 156 A.2d 525 (1959) and *Mellon Square Garage, Inc. v. Public Parking Authority of Pittsburgh*, 442 Pa. 229, 275 A.2d 654 (1971) as authority for their position. Their reliance is misplaced.

In attempting to apply Section 8(4) of the Act to the valet parking transactions primary emphasis has been given improperly by appellees to the transference of possession of the vehicles. In order to show transference of possession or a bailment, *Taylor v. Philadelphia Parking Authority, supra,* is cited. That case held that when the owner of an automobile parked on a commercial parking lot retains control of that vehicle by keeping the keys to it, the nature of the arrangement between the proprietor of the lot and the car owner is one of a lease of parking privileges. The nature of the legal

---

16. 53 P.S.A. § 6908. Limitations on rates of specific taxes
 No taxes levied under the provisions of this act shall be levied by any political subdivision on the following subjects exceeding the rates specified in this section:
 * * * * * * *
 (4) On retail sales involving the transfer of title or possession of tangible personal property, two per cent.

relationship was defined for the purpose of determining who assumes the risk of loss when a theft of contents of the parked automobile occurs. Mr. Justice McBride, speaking for the Court, commented, "The characterization of the relationship as a bailment or a lease . . . is based solely on whether the alleged bailor delivered the custody and control of the item to the bailee." 398 Pa. at 12, 156 A.2d at 527. But the categorization of the transaction as a bailment, and thus a transference of possession of property, does not aid in analysis here. The emphasis in Section 8(4) is upon "retail sale" primarily, and upon the transfer of title or possession of tangible personal property secondarily. The "retail sale" component of Section 8(4) is constricted by the modifying phrase "involving the transfer of title or possession of tangible personal property," not replaced by it. And since in bailment transactions the transference of possession is temporary, no ownership interest is transfered and the bailee's possession is on behalf of the bailor,[17] a bailment cannot meet this Court's essential element inherent in the definition of a sales tax: a tax imposed upon a transaction whereby property is acquired. *Mellon Sq. G. Inc. v. Pub. P. Auth. of Pitts., supra; Blauner's, Inc. v. Philadelphia*, 330 Pa. 340, 198 A. 889, 892 (1938). Neither in our definition of a sales tax nor under Section 8(4) was the acquisition or possession of property intended to be a temporary one for the benefit of another. Further examination of the secondary consideration of transfer of possession is unnecessary. We hold there has been no sale when a valet parking transaction occurs.

Seeking further support of their proposition that the transaction is a sale, appellees cite dicta in *Mellon Sq. G. Inc.*

17. A bailment is defined as:
 A delivery of goods or personal property, by one person to another, in trust for the execution of a special object upon or in relation to such goods, beneficial either to the bailor or bailee or both, and upon a contract, express or implied, to perform the trust and carry out such object, and thereupon either to redeliver the goods to the bailor or otherwise dispose of the same in conformity with the purpose of the trust.
 Black's Law Dictionary (5th ed. 1979) p. 129.

*v. Public P. Auth. of Pitts., supra.*[18] The gratuitous statement in *Mellon* is not operative in this analysis and the advancement of it is a profound disservice to the fundamental soundness of the holding in that case.

When the patrons of valet parking pay the parking operators, they pay, not for the acquisition of property, but for the use of the parking lot and the valet service. Possession of the vehicle is temporarily transferred to the operator of the lot for the patrons benefit and is returned. This is not a "retail sale." The court below was in error in concluding that the tax upon valet parking transactions was controlled by Section 8(4) of the Act and the rate of the tax on valet parking need not be reduced to 2%.

A close reading of the record reveals that the agreement entered into by the District regarding no requirement of the posting of a bond by appellees pending appeal was operative for only thirty (30) days after the trial court's decision on the merits. Therefore, appellant is not prevented from raising the issue. However, the requirements of Section 6 of the Act, 53 P.S. § 6906 provide for the posting of security in the amount of five hundred dollars ($500.00). A bond in this amount was posted by appellees. Additional security was not necessary as the tax moneys have been collected from the patrons and placed in escrow by the parking lot operators. (R. 449a).

Accordingly, the order of the Commonwealth Court affirming the order of the Court of Common Pleas of Allegheny County is reversed and the objections to the tax are dismissed.

ROBERTS and McDERMOTT, JJ., concurred in the result.

FLAHERTY, J., did not participate in the consideration or decision of this case.

18. "If Mellon Square Garage were merely a collector of the tax from its patrons, its argument [that the tax was a sales tax] would be persuasive."
442 Pa. at 233, 275 A.2d at 657.